UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

GRANT TONER,

    Plaintiff,                                Case No. 11-10835
                                                 Honorable Thomas L. Ludington

v.

VILLAGE OF ELKTON; SCOTT JOBES,
individually and in his official capacity,

    Defendants.
_____/

## OPINION AND ORDER GRANTING
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff alleges that the Defendants used excessive force during his arrest. The issue raised by Defendants' request for summary judgment is what authority to accord an audio recording of the arrest, which does not align with the plaintiff's claims.

Plaintiff Grant Toner filed a complaint against Defendants Scott Jobes and the Village of Elkton on March 1, 2011. Pl.'s Compl., ECF No. 1. He alleges that Defendant violated his Fourth Amendment rights pursuant to § 1983, and that the Village of Elkton's police policy "directly and proximately" caused his damages. Defendants Jobes and Elkton filed a motion for summary judgment. In its response, Plaintiff acknowledged his allegations against the Village of Elkton "will not lie." Pl.'s Resp. 19. Accordingly, this claim will be dismissed. As explored below, Plaintiff's allegations against Defendant Jobes are similarly meritless, and Defendants' motion will be granted.

**I**

Plaintiff has worked for Ford Motor Company since May of 1990. In addition, he is a farmer and a journeyman millwright. He typically does millwright work from his own property in the morning, works the afternoon shift at Ford's Romeo plant, and helps out on the farm during harvest time. Plaintiff owns Toner Farms, comprising four-hundred acres, and operates Two-T Farms with his son Joel, a partnership with another one-hundred acres. Plaintiff and Joel often rent land from other farms to supplement their own five-hundred acres. They grow corn, wheat, soy beans, hay, navy beans, and sugar beets.

Plaintiff woke on the morning of October 19, 2008 at around 6:00 a.m. He left the house he lives in with his wife Kim, and drove to his legal residence, where he receives mail and does millwright work. That day, Plaintiff and his son Joel were going to plant wheat on Marty Burzyck's farm, land Two-T Farms was renting. By noon, Plaintiff and Joel had moved the tractors, planter, and wagons necessary for the planting to Marty's farm. During the process, Plaintiff hooked tractors and trailers together, something that required "heavy lifting." Pl.'s Dep. 107.

Joel then began planting the fields. Meanwhile, Plaintiff went to Marty's house, which is right around the corner from the farmland. Marty and Plaintiff went to subway for lunch, and then returned to Marty's house. They reminisced about Plaintiff's uncle, who had just passed away. Although Plaintiff does not normally consume alcohol, the topic of his uncle inspired his interest, and the men started drinking. Over the next couple hours, Plaintiff had "six or seven beers." Pl.'s Dep. 104. He also had a shot of Schnapps liquor. *Id*. 172-73. Despite the fact that he normally does not drink, Plaintiff believes that he was not drunk. *Id*. at 105.

While they were drinking, Plaintiff and Marty drove over to the fields a few times to check on Joel. They helped him put fuel in one of the tractors, and moved some of the equipment around: the wagons, the tractors, and a truck. They also "picked up some rocks," and did a few other tasks. *Id*. at 108. In between trips to the fields, they returned to Marty's house to continue drinking. By about six or seven o'clock, Joel was hungry, and Plaintiff and Marty decided to get him something to eat. So they piled into Plaintiff's blue Ford truck, and drove to a local bar. *Id*. at 110. After ordering a cheeseburger for Joel, Plaintiff and Marty decided on a few more rounds. Plaintiff testified he had "a couple beers" during the thirty-minute wait for Joel's burger. *Id*. After the food was prepared, Plaintiff again directed his Ford pickup out onto the roadways.

Around that time, Defendant Jobes (hereinafter "Defendant") was on patrol in his police cruiser. He was approached by a motorist, who claimed he had almost been struck by an "older blue ford diesel pickup." Def.'s Mot. Ex. 1, at 2, ECF No. 17. When the motorist pulled up next to the truck, the driver "began yelling at him" with slurred speech. *Id*. The motorist informed Defendant the truck was at the Clark gas station nearby, and Defendant went to investigate.

Upon arriving at the Clark gas station, Defendant saw a blue truck pull out and turn north onto Main Street. It was Plaintiff and Marty, on their way back to the farm with Joel's food. As Defendant followed, he paced Plaintiff at ten miles-per-hour over the speed limit. *Id*. Then, Defendant saw Plaintiff begin to turn left onto Marx Road, just in front of oncoming traffic. Another vehicle was forced to swerve to avoid a collision. *Id*. Defendant initiated his emergency lights, and pulled Plaintiff over on Marx Road, just off of Main Street. *Id*.

When Defendant turned on his emergency lights, his dashboard camera was engaged. The camera captures activity in front of Defendant's cruiser, and includes microphones that

record any accompanying audio. The audio and video from the October 19 stop displays Defendant approach Plaintiff's vehicle and ask for his license, registration, and insurance information. Defendant wrote in his report that while Plaintiff was retrieving the information, he "noted a strong odor of alcohol coming from the vehicle." *Id*. After inquiring where Plaintiff was going, Defendant asked if he had been drinking. Plaintiff responded, "A little bit." Def.'s Mot. Ex. 4, at 1:14. When Defendant asked how much, Plaintiff replied, "Ahhh, a couple of beers." *Id*. at 1:17. Defendant then asked Plaintiff to turn off his truck and step out.

The video depicts an unsteady Plaintiff step from his truck. Defendant asked Plaintiff if he knew why he was pulled over. Plaintiff thought it was probably because he had been "speeding a little bit." *Id*. at 1:35. When Defendant confirmed it was Plaintiff's speed, along with his dangerous turn into oncoming traffic, Plaintiff replied, "Yea, I seen that." *Id*. at 1:45. Plaintiff then told Defendant he had just come from a bar, where he had consumed "a couple of beers." *Id*. at 1:55. He also told Defendant Marty Burzyck was the other person in his truck. *Id*. at 2:08. Defendant returned to his cruiser, reported Plaintiff's information to the dispatcher, and indicated he planned to conduct a sobriety test. *Id*. at 3:30–55. Meanwhile, Plaintiff stood between his truck and Defendant's cruiser, swaying noticeably.

The video next shows Defendant taking Plaintiff through a number of sobriety tests. Plaintiff wobbled back and forth as he attempted to take sixteen steps, touching heal-to-toe each time. *Id*. at 5:40–6:00. He could not balance on one foot for more than a few seconds, and after two attempts Defendant cut the test short. *Id*. at 6:40–7:00. Although he was inebriated, Plaintiff was able to recite the ABC's, stopping at S. *Id*. at 7:21. Finally, Defendant conducted a preliminary breath test, which revealed that Plaintiff's blood-alcohol level was .166 — over twice the legal limit. *Id*. at 9:35. At that point, Defendant placed Plaintiff under arrest for

driving under the influence of alcohol. *Id*. at 9:50. Defendant handcuffed Plaintiff's hands behind his back, and asked if the cuffs were too tight. *Id*. at 10:17. Plaintiff responded, "No." *Id*. at 10:18. Defendant searched Plaintiff's pockets, confiscated his jack-knife, and then escorted Plaintiff out of the camera's view to the side of his cruiser. *Id*. at 10:25–55. However, the audio continued to record what happened.

Just as Defendant was handcuffing Plaintiff at the front of the police cruiser, Deputy Todd Schember arrived at the scene. Schember Dep. 6. As Defendant walked Plaintiff to the side of the cruiser, Plaintiff complained, "The left cuff is awful tight." Def.'s Mot. Ex. 4, at 11:10. Defendant told Deputy Schember, "Get your light a minute, Todd." *Id*. at 11:25. When Defendant asked "Is that good?" Plaintiff responded "Yea." *Id*. at 11:45. Although the video did not capture any of these events, they are revealed through the audio.

Defendant then opened the back-door of the cruiser, and asked Plaintiff to have a seat inside. *Id*. at 11:58. He said, "It's kind of a tight squeeze." *Id*. at 12:00. Defendant responded, "K," and can be heard entering the vehicle. Defendant then told Plaintiff, "If you'll feel more comfortable you can put your back, like, that way and put your legs up." *Id*. at 12:09–16. Defendant then said, "A little more. Ok?" *Id*. at 12:20. Plaintiff responded, "K," *id.* at 12:22, and Defendant shut the back door with a final "alright." *Id*. at 12:23. Only twenty-three seconds elapsed from the time Defendant opened the back-door to when he closed it with Plaintiff inside. Notably, Defendant can be heard chewing gum the entire time. No other sounds were recorded. Defendant maintains that he did not help Plaintiff into the police cruiser. In fact, Defendant testified, "I never help people into the vehicle." Def.'s Dep. 29. Deputy Schember confirmed that Plaintiff "got into the car on his own." Schember Dep. 7. Deputy Schember testified Defendant "told [Plaintiff] how to sit so he would be more comfortable." *Id*.

Plaintiff claims otherwise — that a lot happened during those twenty-three seconds that was not picked up by the audio. Specifically, Plaintiff claims that Defendant "knocked the shit out of [him]," Pl.'s Dep. 136, that he maliciously "rammed [Plaintiff's] head against the door," knocking his hat off. *Id*. at 135. According to Plaintiff, Defendant began laughing and asked, "Do you really want that hat?" *Id*. Plaintiff claims Defendant had a hold of his handcuffs by the chain and pulled on them forcefully, knocking Plaintiff off balance and tearing the rotator cuff in his right shoulder. Pl.'s Resp. 3. Plaintiff testified he heard a pop, and experienced "extreme pain." *Id*. Finally, Plaintiff claims Defendant shoved him into the car sideways. Pl.'s Dep. 143.

After Plaintiff was in the back of the police cruiser, he did not cry out in pain, moan, or ask for help. Despite the absence of these sounds, Plaintiff's breathing is audible, and he can be heard talking to himself: "1.66." Def.'s Mot. Ex. 4, at 12:36. "Jobes." *Id*. at 13:00. "There we go, get rid of it mother-fucker," followed by maniacal laughter. *Id*. at 16:34–40. "I'm going to jail." *Id*. at 16:54. "I could bail myself out, but…" *Id*. at 17:20. "1.6…Bullshit." *Id*. at 17:20. "Jobes." *Id*. at 17:35.

During this time, Defendant returned to the blue pickup where Marty Burzyck was waiting. Marty made no claim that night, and has since made no claim, that Defendant abused Plaintiff. Instead, Marty admitted Plaintiff was intoxicated, and was driving dangerously. "I knew [Plaintiff] was fucked up. But, you know, he pulled in front of that car, I seen, I said 'you dumbass.' " *Id*. at 13:54–14:00. Defendant responded, "That's how people get killed. Just something like that, you know, it wasn't good." *Id*. at 14:01–04. Marty then told Defendant that Plaintiff's son Joel was sober, and offered to walk down to the field and get Joel to pick up the truck. *Id*. at 14:34–15:55. Defendant agreed, and after Marty left to get Joel, Defendant found

- 6 -

two open beer cans in the truck. *Id.* at 16:30–17:00. Aside from Plaintiff's mutterings, detailed above, the remainder of the video is uneventful.

Plaintiff was then taken to the Huron County Jail, booked, and housed for the night. Def.'s Mot. 5. Nowhere in the booking records is there any indication that Plaintiff was injured during the course of his arrest. Def.'s Mot. Ex. 7. His intake photograph does not display any noticeable injuries to his head. *Id.* at 2. Under the "Medical Screening – Visual Opinion" section, the intake officer, Kathryn Carter, noted no signs of trauma. *Id.* at 3. When asked if he had recently experienced a head injury, Plaintiff responded "No." *Id.* He stated he was in "sort of good health," but that he had a heart problem. *Id.* After screening Plaintiff, Officer Carter observed that he smelled of alcohol, was uncooperative, and unpleasant. *Id.* at 7. Plaintiff admitted he was "very uncooperative" during the procedure. Pl.'s Dep. 165.

Plaintiff was then taken to a local hospital for a blood-draw. Plaintiff got into Defendant's cruiser to go to the hospital on his own. *Id.* at 154, 159. Once at the hospital, Defendant helped Plaintiff exit the vehicle, without event. *Id.* at 160. When the blood draw was completed, Plaintiff got back into Defendant's car without assistance. *Id.* at 164. After they arrived back at the jail, he was able to exit on his own. *Id.* at 165. Defendant never once assisted Plaintiff into the vehicle. The next day, Plaintiff was released, and eventually pled guilty to operating while intoxicated in a hearing before Judge Knoblock. *Id.* at 187–89.

At no time during any of these events did Plaintiff claim Defendant had violated his rights or injured his shoulder. He did not tell the nurse who took his blood at the hospital. *Id.* at 163. He did not tell any of the other officers at the jail where he was booked and held. *Id.* at 167. Plaintiff claimed he did not tell anyone about his injuries, or Defendant's alleged conduct, because "they're all in cahoots, and they're all buddies and pals. They all go drinking. They all

go bowling together. Why would I say anything to them?" *Id*. Plaintiff also never shared his concerns with Judge Knoblock during his hearing, maintaining, "Why would I? I told you, they're in cahoots." *Id*. at 189.

Plaintiff went to see a doctor about pain in his shoulder about a week after his arrest. *Id*. at 71. He was sent to get an MRI, and referred to Dr. McManaman. *Id*. Plaintiff visited Dr. McManaman a few weeks later. *Id*. Dr. McManaman informed Plaintiff he had a one-inch tear in his rotator cuff. *Id*. at 72. Plaintiff asked Dr. McManaman if the injury could occur from being handcuffed and somebody picking you up by the cuffs. Dr. McManaman said it was possible. Dr. McManaman told Plaintiff he could also have been injured while lifting things, lifting things over his head, even "from falling down." *Id*. at 74. According to Dr. McManaman, "[t]here is no way of knowing" what caused the injury. *Id*. at 75.

On March 1, 2011, Plaintiff filed a complaint against Defendant. Plaintiff's complaint charges Defendant of violating his Fourth Amendment rights pursuant to 42 U.S.C. § 1983. The complaint alleges Defendant "needlessly and repeatedly dragg[ed] [Plaintiff] by his arms while handcuffed; pull[ed] forcefully on [Plaintiff's] arms while they were handcuffed behind his back, tearing [Plaintiff's] right rotator cuff; and otherwise consistently us[ed] unnecessary and excessive force in effectuating the arrest and transporting [Plaintiff]." Pl.'s Compl. ¶ 28. Defendant moved for summary judgment in June 2012.

**II**

Summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The focus must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52 (1986). Generally, all justifiable inferences from the evidence must

be drawn in the nonmoving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

An exception to this general rule arose from the Supreme Court's ruling in *Scott v. Harris*, 550 U.S. 372 (2007). In that case, the plaintiff alleged police used excessive force when they rammed his car to end a high-speed chase. *Id*. at 375-76. The plaintiff claimed that "during the chase, there was little, if any, actual threat to pedestrians or other motorists, as the roads were mostly empty and [he] remained in control of his vehicle." *Id*. at 378 (internal quotations omitted). The Court, however, noted a videotape from the defendant police officer's cruiser told "quite a different story." *Id*. at 379. The video showed the plaintiff's vehicle "racing down narrow, two-lane roads in the dead of night at speeds that are shockingly fast. . . . swerve[ing] around more than a dozen other cars, cross[ing] the double-yellow line, and force[ing] cars traveling in both directions to their respective shoulders to avoid being hit." *Id*. The Court indicated that unlike the cautious and controlled driver the plaintiff claimed to be, "the video more closely resembles a Hollywood-style car chase of the most frightening sort, placing police officers and innocent bystanders alike at great risk of serious injury." *Id*. at 380.

The Court concluded that facts must be viewed in the light most favorable to the nonmoving party "only if there is a 'genuine' dispute as to those facts." *Id*. (quoting Fed. R. Civ. P. 56(c)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

In resolving questions of qualified immunity, courts must perform a two-step analysis. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). First, a court should determine whether the facts

show "the officer's conduct violated a constitutional right[.]" *Id*. Second, the court must consider "whether the right was clearly established." *Id*. When a defendant raises a qualified immunity defense, the plaintiff bears the burden of demonstrating that it does not apply. *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006).

### III

### A

The first step in assessing the constitutionality of Defendant's actions is to determine the relevant facts. As in *Scott*, the parties' versions of events here differ substantially. Defendant and Deputy Schember assert that Plaintiff got into the car on his own, without further incident. Plaintiff claims Defendant was violent and malicious — smashing Plaintiff's head and laughing, tearing up his shoulder, then shoving him into the car. In a case such as this, the plaintiff's version of the facts is usually adopted. *Scott*, 550 U.S. at 380. However, a court need not adopt a plaintiff's version of events if they are "blatantly contradicted by the record, so that no reasonable jury could believe it[.]" *Id*. at 380.

In this case, Plaintiff's claims are blatantly contradicted by the video and audio associated with his arrest, along with the other information from the record. First, in his response to Defendant's motion, Plaintiff claims he was forced to turn into oncoming traffic because of a dog in the roadway. Pl.'s Resp. 2. The video and audio establish that Plaintiff acknowledged he performed a dangerous turn, and he never mentioned a dog. Marty Burzyck stated he knew Plaintiff made a dangerous turn, that he knew Plaintiff was in trouble when he saw police lights, and Marty never mentioned the presence of a dog in the road. Finally, Defendant testified he did not see any dog on Main Street that would force Plaintiff to swerve into oncoming traffic. Def.'s Dep. 25.

Plaintiff claims that he was abused and placed in the back of Defendant's vehicle before Deputy Schember ever arrived. Pl.'s Dep. 148. The record indicates, however, that Deputy Schember arrived and exited his vehicle before Plaintiff was ever loaded into Defendant's cruiser. Deputy Schember testified he arrived as Plaintiff was being handcuffed. Schember Dep. 6. When Plaintiff complained his handcuffs were too tight, Defendant said, "Get your light a minute, Todd." Def.'s Mot. Ex. 4, at 11:25. It is unclear who Defendant would have been talking to except for Deputy Todd Schember. This happened before Defendant even opened the back door for Plaintiff to enter the police vehicle.

Plaintiff claims that during the arrest, Defendant smashed his head against the door, knocking his hat to the ground. Plaintiff claims Defendant started laughing, asking, "Do you really want that hat?" Pl.'s Dep. 135. The audio reveals Defendant telling Plaintiff the backseat was a tight squeeze with no accompanying laughter, no bangs that might represent someone's head striking the car. After Defendant instructed Plaintiff it would be a tight fit, Plaintiff responded, "K." Def.'s Mot. Ex. 4, at 12:01. There were no grunts, no wails of pain to indicate rough handling. Only the sounds of someone shuffling into the back seat.

Plaintiff alleges that Defendant wrenched back on his arms, tearing his rotator cuff. He claims he heard a pop, and experienced "extreme pain." Pl.'s Resp. 3. No pops were recorded on the video tape. No cries of pain from someone in "extreme pain." Finally, Plaintiff claims Defendant shoved him into the car sideways. Pl.'s Dep. 143. Again, the audio contradicts this claim. The audio confirms Defendant told Plaintiff, "If you'll feel more comfortable you can put your back, like, that way and put your legs up." *Id*. at 12:09-16. After he was situated in the car, Plaintiff audibly responded, "K," *id.* at 12:22, and then Defendant shut the back door. *Id*. at 12:23. Both Defendant and Deputy Schember testified Plaintiff got into the car on his own.

Deputy Schember testified he would have noted in his report if Defendant had used excessive force. Schember Dep. 8. He would have noted in his report if Plaintiff had struck his head. *Id*. at 9. He noted nothing of the kind. In fact, Deputy Schember testified he was "shocked" there was a lawsuit involving Plaintiff's traffic stop. *Id*. at 12.

Plaintiff warns against using audio to contradict his story. Because the alleged wrongdoing occurred off-camera, Plaintiff claims the *Scott* decision does not apply, citing two district court cases to support this proposition. But those cases are distinguishable. In *Mallory v. City of Ferndale*, 2011 WL 891212, at *3 (E.D. Mich. Mar. 11, 2011), the court specifically noted the video tape did "not have audio." That is why the video, which did not capture the majority of the conduct at issue, could not blatantly contradict the plaintiff's story. *Id*. at *5. In *Kies v. City of Lima*, 612 F. Supp. 2d 888, 895 (N.D. Ohio 2009), a video could not be conclusive because of an umbrella partially blocking the camera's view. Again, the court noted that the video could not contradict the plaintiff's claims because it had "no audio." *Id*. The video in this case did have audio, and it is that audio, along with other aspects of the record, that contradicts Plaintiff's allegations. Although Plaintiff claims *Scott* does not apply because "the events at issue were not captured on video," Pl.'s Resp. 17, the Sixth Circuit has held, "There is nothing in the *Scott* analysis that suggests that it should be restricted to cases involving videotapes. The *Scott* opinion does not focus on the characteristics of a videotape, but on 'the record.'" *Coble v. City of White House*, 634 F.3d 865, 868–69 (6th Cir. 2011) (quoting *Scott*, 550 U.S. at 380–81).

Plaintiff points to *Coble* for the proposition that a "lack of sound on an audio recording" cannot contradict his version of events. Pl.'s Resp. 9. But that is not what the Sixth Circuit determined in that case, and it is not solely the lack of sound that discredits Plaintiff's story here.

In *Coble*, the plaintiff was driving intoxicated when a police officer attempted to pull him over. 634 F.3d at 866. The plaintiff sped away, drove until he arrived at his own home, and parked in the driveway. *Id*. When the officer attempted to question him, the plaintiff told the officer to get off his property, and began walking away. *Id*. At that time, the officer performed a take-down maneuver, breaking the plaintiff's ankle in the process. *Id*. After he was restrained, the plaintiff claimed the officer made him walk on the broken ankle. *Id*. He claimed he screamed in pain, cursed the officer, and demanded he be put down. *Id*. Finally, the plaintiff claimed he was dropped "face-first" onto the pavement. *Id*. The district court concluded that because the plaintiff's screams and curses could not be heard on the audio device worn by the officer, because only shuffling bodies were audible, the plaintiff's story was "blatantly contradicted." *Id*. at 867.

The Sixth Circuit reversed the district court's finding. Although the court found "it was proper for the district court to consider the audio recording," it also noted the plaintiff's testimony was not "blatantly contradicted." *Id*. at 869. The court maintained,

> We do not suggest that discounting a non-movant's testimony at the summary judgment stage on the basis of an audio recording would never be appropriate. An audio recording may very well provide objectively compelling evidence, particularly when it is presented to show what sounds or statements were made . . . . However, an audio recording is less reliable when it is presented to support findings based on the lack of recorded sound.

*Id*. at 870, n.4 (citation omitted). The court did not hold that the absence of sound could not provide objectively compelling evidence. The court stated this use of an audio recording is simply "less reliable," *id*, as "[m]any factors could affect what sounds are recorded, including the volume of the sound, the nature of the activity at issue, the location of the microphone, whether the microphone was on or off, and whether the microphone was covered." *Id*. at 869.

In *Coble*, there was no question that the plaintiff's ankle was broken — he had to be airlifted to a hospital. The only issues were whether the officer made him walk on his ankle, and whether he was subsequently dropped onto the pavement. The court found that despite the lack of recorded screams or falling bodies, a reasonable jury could still believe the plaintiff's version of events.

The same cannot be said here. It is not simply the lack of sound recorded on the audio, but also what was recorded, that blatantly contradicts Plaintiff's allegations. He claims his head was smashed on the car, then Defendant laughed at him and asked if he really wanted his hat. The audio shows Defendant telling Plaintiff the backseat was a tight fit, and Plaintiff responding, "K." Def.'s Mot. Ex. 4, at 12:01. Defendant claims his arms were wrenched backwards, his shoulder popped, and he experienced extreme pain. The only sound is a body shuffling into the vehicle. No pops, no screams, not even a grunt. Plaintiff claims he was then shoved into the car. The audio reflects Defendant advised Plaintiff how to situate himself in order to be the most comfortable. Plaintiff acknowledged he was in — "K" — and then Defendant shut the door. *Id*. at 12:22-23.

The *Coble* court was concerned that the nature of the sound, the activity at issue, the microphone's location, and whether it was covered or even turned on could all undermine the reliability a recording. In this case, those fears are allayed. The microphone was turned on and not covered, and it was not far from Plaintiff. This is shown through the recorded conversation between Plaintiff and Defendant. The nature of the sound or activity at issue does not prevent the audio from contradicting Plaintiff's story. He claims that his rotator cuff was torn, that he experienced extreme pain, that his head was smashed into the car, and that Plaintiff laughed and taunted him. None of this was recorded. What is audible is Defendant chewing gum. No

reasonable jury would believe that Plaintiff's abuse and Defendant's jeers went undetected when the sound of Defendant's chewing was clearly identifiable.

In *Howard v. Smith County, Tenn.*, 2011 WL 4361486, at *9 (M.D. Tenn. Sept. 19, 2011), the court held that the plaintiff did not complain about her handcuffs being too tight, as "[t]he recording of the incident confirms." The court used the absence of the plaintiff's complaints on an audio recording as evidence she did not complain, where a multitude of other statements were recorded during the course of the arrest. The same proposition applies in this case.

Further, both Defendant and Deputy Schember testified that Plaintiff got into the car on his own. Plaintiff reported no abuse at the police station, at the hospital, or during his hearing before Judge Knoblock. The intake officer at the station noted no signs of trauma, Plaintiff claimed to be in good health apart from his heart, and claimed no recent head injuries. Taken together with the audio from October 19, this record "blatantly contradicts" Plaintiff's claims.

This conclusion is buoyed by the injury at issue. Dr. McManaman told Plaintiff that there was no way to know what caused his injury, that it could result from lifting or even falling down. Plaintiff believes Defendant hurt his shoulder "because it was not like that prior to that night." Pl.'s Dep. 78–79. However, the morning of October 19, Plaintiff was involved with what he called "heavy lifting" as he moved farming machinery. Pl.'s Dep. 107. After six or seven beers and a shot of liquor he was busy lifting and carrying rocks around Marty's farm. *Id*. at 108. Just the type of activities that could cause a torn rotator cuff.

The only evidence Plaintiff offers to contest Defendants' motion are his own statements as to the events. This Court, however, is "not required to accept unsupported, self-serving testimony as evidence sufficient to create a jury question." *Brooks v. American Broadcasting*

*Companies, Inc.*, 999 F.2d 167, 172 (6th Cir. 1993). Plaintiff's claims do not withstand the sturdy record, especially in the light of his injuries. His version of the events will be disregarded for purposes of Defendants' motion for summary judgment.

**B**

Based on the facts as presented by the record, absent Plaintiff's unsupported allegations, Defendant did not infringe on Plaintiff's rights, and is therefore entitled to qualified immunity.

Qualified immunity is an affirmative defense which shields government officials from civil liability when their discretionary conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The qualified immunity inquiry involves determining: (1) whether a constitutional violation occurred; and (2) whether the right infringed was clearly established. *McKinley v. City of Mansfield*, 404 F.3d 418, 429-30 (6th Cir. 2005). A court is to use its "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan,* 555 U.S. 223, 236 (2009).

"There is no doubt the right to be free from excessive force is clearly established because, in 1989, the Supreme Court held the use of force that is not objectively reasonable violates the Fourth Amendment." *Howard*, 2011 WL 4361486, at *6 (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989)). Nevertheless, Defendant is entitled to qualified immunity because Plaintiff has not shown he was subjected to excessive force during the course of his arrest.

As discussed at length above, the video and audio from October 19, 2008 indicates Defendant conducted himself as any police officer should. He was calm and courteous, protected Plaintiff during the course of the stop, and acted reasonably at all times. When he first

handcuffed Plaintiff, he asked if the cuffs were too tight. When Plaintiff later complained, Defendant immediately loosened them. He advised Plaintiff that the backseat of his vehicle was small, and instructed him how to sit comfortably. He then made sure that Plaintiff's truck would be recovered, and that Marty Burzyck did not attempt to drive. Only Plaintiff's self-serving statements cast doubt upon Defendant's professionalism. Because those statements are blatantly contradicted by the record in this case, they need not be considered. As such, Plaintiff has not demonstrated that his constitutional rights were violated, and Defendant is entitled to qualified immunity.

## IV

Accordingly, it is **ORDERED** that Defendants' Motion for Summary Judgment, ECF No. 17, is granted.

It is further **ORDERED** that Plaintiff's complaint, ECF No. 1, is dismissed with prejudice.

>                     s/Thomas L. Ludington
>                     THOMAS L. LUDINGTON
>                     United States District Judge

Dated: October 4, 2012

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on October 4, 2012.

>                  s/Tracy A. Jacobs
>                  TRACY A. JACOBS